## STATE v. ARTHUR KNAPP.

On the trial of an indictment for a rape, evidence of the health and physical condition of the prosecutrix at the time of the alleged offence is competent, as bearing upon her ability to resist the respondent.

It is also admissible to show the strength of the respondent as displayed in encounters with other men.

Evidence of previous acts of unchastity with other men is not admissible.

It is competent for the prosecutrix to state that she made complaints to her mother a week or ten days after the offence, and that she thus delayed making complaint for the reason that her parents were out of health and she feared the effect upon them.

Evidence of previous solicitations by the respondent is admissible to prove the existence of a motive or passion.

Where the respondent adduced evidence of his reputation for morality as well as chastity, it is competent on cross examination for the government to inquire as to his reputation for selling liquor without license.

Where immediately preceding a view by the jury of the place where the offence was alleged to be committed, a change was made in the condition of the place, by a person who had been acting for the government, that might in one view have seriously prejudiced the respondent: *Held* that the burthen was upon the State to satisfy the court that the respondent could not have been injured; and that it was not enough to render it more probable, merely, than otherwise, that no injury had been done to him.

INDICTMENT for rape upon one Sarah Maria Philbrick, on the 16th of December, 1861. Mrs. Philbrick was at the time residing with her father, Mr. Israel Perkins, of Warren. The evidence for the State tended to show that on said day Mrs. Philbrick was alone at the house, and that the respondent knowing that fact, drove from Warren village up northerly to this house, about one o'clock in the afternoon, hitched his horse at a post by the corner of the house, went into the house and committed the crime, then left and drove on further north, and in course of about an hour returned and called again at the house, and finding one Deacon Berry there he made some errand and soon left, and returned towards the village.

Two points were made by the defence:

1. That respondent, although he went up and was at the house about one o'clock, did not go into the house at all on that occasion, when the rape was alleged to have been committed.

2. That it was impossible that a rape could have been committed by respondent upon Mrs. Philbrick, if she had resisted to the utmost of her power. Much testimony was introduced tending to show the comparative strength of the parties. The evidence for the State tended to show that the prosecutrix was somewhat intimidated at the time of the alleged rape, by the language and manner of respondent, and the testimony of the medical witnesses tended to show that if such were the fact, that would lessen the power of resistance.

Mrs. Philbrick was allowed to testify, defendant excepting, that at the time (Dec. 16,) she was in feeble health; that she had been suffering three or four years from a very lame and weak back, caused by certain ill treatment which she received just before the birth of her little boy, about three years before the time of the alleged rape, and by a protracted and severe labor, continuing through three nights and two days at the

birth of her boy, from which she had never recovered, and for which troubles she had doctored ever since.

She also testified, without objection, that she had been very sick in the fall of 1861, with fever and dysentery, and had not recovered her strength on the 16th December, and that she was and had been for the three years past troubled with a lame stomach and with female weakness.

Mrs. Pillsbury, a witness for the State, was allowed to testify, subject to defendant's exception, that she had known the state of Mrs. Philbrick's health, more particularly since the birth of her child; that it had not been near so good since as before; that she had a very severe fit of sickness in the fall of 1861, and that she recovered very slowly after she began to mend; she was not as well (the witness thought) up to the 16th of December, as before her sickness. "I considered her very sick, she had fever and dysentery. The latter was very severe, to my knowledge. I saw her several times during her sickness. I think her health has not been as good since the birth of her child as before; she has frequently complained to me of a weakness and pain in the spine, of a trouble in her stomach, of her food troubling her, and of female weakness."

There was considerable evidence tending to show that respondent was, at the time of the alleged rape, and for the last fifteen years or more had been, a man of more than ordinary strength. It was in evidence that he had taken a barrel of flour up in his hands before him and carried it several rods, and then down several stairs or steps into a cellar; also, that he had within a few years carried a barrel of sugar some ten rods on his shoulder and then set it down on a platform, and of his putting one or more Frenchmen out of his tavern house in Warren, and the circumstances under which it was done. One Getchel testified that he was present on both occasions, and saw Knapp carry the barrel of flour and of sugar, and he was allowed to state, subject to defendant's exception, that Knapp "seemed to carry them easily." One of these occurrences was only the winter before the alleged rape, the other somewhat longer.

One Glazier, a witness for the State, was allowed to state, subject to defendant's exception, that about fifteen years ago, he had an encounter or contest with defendant at a Town Meeting, at the meeting house in Haverhill, which he described, in which Knapp overcame his strength and pushed him (the witness) through the aisle of the meeting house. Witness also testified that he had lifted upon scales with others the last fall, upon a trial of strength, and stated the amount he was able to lift in that way. He also testified that he should call Knapp a very active man, that he had seen him load wood upon the cars, and had assisted him one day in loading three cars of wood.

One Whicher was allowed to state, subject to the defendant's exception, that he had a scuffle with Knapp some six or seven years ago, and to describe it, in which he said that Knapp was too much for him. Witness also stated his own weight at 165 or 170 pounds, and was allowed to state, as tending to show his own strength, how much he had lifted upon a trial of strength with others, some nine years ago.

One Eben Swain was allowed to state, subject to defendant's exception, that one year ago last Fourth of July, there was a scuffle at the

house on the top of Moosehillock, in which some men were making dis-, turbance, and that Knapp, being called on by the keeper of the house to assist him, put one of the men engaged in making the disturbance out of the house, describing the man and the manner in which he was put out.

Dea. Berry, a witness for the State, who was a near neighbor, and as the evidence tended to show on intimate terms with Mr. Perkins and his family, testified that on two occasions, once about two years and again about a year ago, he had business in the neighborhood of Mrs. Philbrick's relatives in Campton and that neighborhood, and that he had carried her down to visit her friends and left her at her relatives', and had gone on and transacted his business, and on his return had called for her and carried her home. He was asked by defendant's counsel if he had not made a statement in reference to one of these journeys, intimating that he at that time had sexual intercourse with Mrs. Philbrick. He said he did not recollect making any such statement, and did not think he ever did. Defendant then offered to prove by one Gale, that said Berry did make such a statement to him, or in his presence, which being objected to by the State, was excluded by the court, defendant excepting.

Mrs. Philbrick had been asked by defendant's counsel, on cross examination, if she had not been guilty of acts of gross lewdness, and of lascivious behavior, specifying the acts and behavior, before the alleged rape, with or in presence of other men beside the defendant, which she denied. Defendant then offered to show by one Hodgdon and four others, that she had been guilty of such particular acts of lewdness, and such behavior, with or in presence of the witnesses, before the alleged offence, which being objected to by the State, was excluded by the court, defendant excepting.

Mrs. Philbrick was allowed to state, subject to defendant's exception, that she first informed her mother of the ravishment a week or ten days after it happened, which was the first communication she had made on the subject.

She was also allowed to state, subject to defendant's exception, that the reason why she did not inform her parents of it on the day when they returned, was that her father and mother were out of health, and were so slim that she was afraid it would overcome them and be the means of their death; that her father had always been sickly since she could remember, and she had always been careful to keep all troubles from him, lest it should make him worse; that this was the only reason why she did not make complaint sooner to her mother.

Said Berry testified that he called at the house where Mrs. Philbrick was in the afternoon of 16th December, and as the State's evidence tended to show, soon after Knapp had left it the first time, and that he remained some 20 or 30 minutes, when he arose and spoke of leaving, and that thereupon Mrs. Philbrick looked at him and said she wanted he should stay till her father came home. He was then asked what her appearance was when she made this request. He answered that she appeared to be in earnest and mean what she said. This answer was ob-

jected to, and was ruled in, subject to defendant's exception.　He further testified, without objection, that he sat down and remained some ten minutes more, and Knapp came in, made some errand, staid only a few minutes, and then left and went down street; and that when witness first went into the house, Mrs. Philbrick's eyes were red and swollen, as though she had been weeping.

Mrs. Perkins, the mother of the prosecutrix, was a witness for the State, and the following question was allowed to be proposed to her, subject to defendant's exception:　"Describe Mrs. Philbrick's appearance on the 16th December, on your return, (after the alleged rape,) and so immediately after that, stating only those things which you noticed on the 16th, and such as continued from that day onward, state particularly."　Witness answered, subject to defendant's exception, "She appeared cast down, and troubled about something; she had not got her washing done when I returned, and wanted I should help her. She went to bed that night earlier than common, went as soon as it was dark; I asked her if she was sick; she said she was very tired.　The next morning she did not rise as early as usual, complained of being sick and lame all over.　She retired early, and laid late in the morning; after that she often wept about something."　(It appeared that Mrs. Philbrick slept in a bed-room adjoining the room in which Mr. and Mrs. Perkins slept.)　"Her bed-room door, which had usually been left open nights before that, was closed by her on the 16th, and the same after that, until she informed me of the facts.　Every day the tears would roll down her cheeks at times, and when she had been alone and I came in, I could see that she had been crying."

Mrs. Philbrick, being recalled, testified that she had been weeping when Dea. Berry called in, on the 16th, and that on the night of that day she wept in her bedroom, and that she did so every night with her door shut, so that her parents might not hear her, till she informed her mother of the rape; that after that she wept nights the same as before, but that her bedroom door was left open.

Mrs. Perkins was then recalled, and allowed to state, defendant excepting, that she did not hear Mrs. Philbrick weep on the night of the 16th, not after that in the night, while she kept her bedroom door shut, but that after the door was left open nights, which was the case after she had informed witness of the rape, she often wept and sobbed so in the night as to disturb Mr. Perkins and the witness.

Mrs. Philbrick was allowed to testify, defendant excepting, that on two several occasions in the spring next previous to said 16th December, the defendant came into the house, where she was alone, and after speaking to her, and inquiring if her father was at home, and being informed that he was not, on the first occasion, he brought a chair along and sat down by the side of the witness, took hold of her hand, and asked her to sit in his lap, and tried to pull her into his lap, that she told him to let go of her, and to leave the house, which he did; that on the second occasion, which was soon after the first, after inquiring for her father, &c., he came up to the witness and took hold of her arm, and made a very indecent proposal to her, and asked her to go into another

room with him, that she told him she would not do so, and ordered him to leave the house, and not come there again when her father and mother were absent; that he then left, and from that time to December 16th, she had never been left alone at all.. The State offered to prove that the prosecutrix had taken particular pains to prevent being left alone, after these visits in the spring, until the next winter, and to show what she had done thus to prevent being left alone, but the court excluded the testimony.

The court, in charging the jury, called their attention to the fact that much time had been consumed and much expense incurred in the trial, that the expenses on both sides had been paid by the State, and every facility had been furnished to both sides to procure their testimony; that particular care had been taken by the court and by the counsel on both sides, to see that the jurors were entirely unobjectionable to either party; that the case had been tried by able counsel, and that neither party could probably reasonably expect to lay their case more fully or favorably before any jury at any time, than had been done at that time and before them; that under these circumstances, it was very important that they should agree upon a verdict; that it would be their duty to retire, not with any feelings that they would have the verdict one way or the other, or no way, but with a determination to consider and weigh the evidence, and then first of all to agree, and second to agree right.

Evidence was introduced, tending to show that the prosecutrix was pregnant at the time of the trial, (about the first of May,) and had been so for a period of about four months and a half, and the medical witnesses on both sides, who were examined as experts, three on behalf of the State, and four on behalf of respondent, all testified that pregnancy was just as likely to take place in case of rape as in case of voluntary sexual connection. Whereupon, the court instructed the jury that the fact of pregnancy was only evidence that Mrs. Philbrick had had sexual connection with somebody, but that it was no evidence either way, upon the question, whether that connection was voluntary or forcible.

Evidence had been introduced upon trial, of the respondent's good reputation or character. The counsel for the State had read, as a part of his argument, from the charge of Shaw, C. J., in *Commonwealth v. Webster*, 5 Cush. 324 & 5, and claimed that in this case, this evidence of good character should not have as much weight as in cases where the offence charged was of a lesser grade. The court instructed the jury that the effect of such evidence might vary somewhat with the nature of the offence charged, and also with the degree of directness, and of weight of the evidence adduced, as proof of the charge; that in this case they might find, from all the testimony, whether there was anything thus affecting this evidence, but that in this case, as in any other, they must require more evidence to convict a man who had thus proved his good reputation, than in case that reputation were bad or questionable, and more than they would to overcome the mere presumption of innocence, which the law raises in case there is no evidence in regard to defendant's reputation; that they must consider the improbability that a man of good character and reputation for chastity and morality, would commit such an

offence, and that the evidence for the State must remove all reasonable doubts founded upon that improbability, as well as on all the other evidence.

In making the inquiries in regard to defendant's reputation, his counsel were allowed, notwithstanding the State's objection, to put the question to his witnesses in this form : "State what the respondent's general reputation was on the 16th day of December last, or before, for morality generally, and particularly for chastity ?"  On cross examination of some of defendant's witnesses, who had testified that his reputation for morality and chastity was good, the State's counsel was allowed, subject to defendant's exception, to ask the witness if Knapp had not a general reputation of being a seller of liquor in violation of law ?  Which question was answered in the affirmative.  And the court instructed the jury that they might consider this evidence in connection with the evidence of his good reputation for morality, though it would not bear on his reputation for chastity.  To all which instructions defendant excepted.

Benjamin Clement and Charles Carpenter, two witnesses for defendant, testified that they were in a position, (describing it,) where they saw the defendant when he went to the house where Mrs. Philbrick was at the time of the alleged rape, that they saw him as he drove up in the road to the house, that he did not hitch his horse to the post at the corner of the house, but drove him up in front of the house, and some distance from it ; and that he went to the door and appeared to rap, and after waiting there a minute or two, that he left without going into the house at all, got into his carriage and drove up the road ; that they were looking at him all this time, and could see him plainly.  The State offered evidence, tending to show that these two witnesses standing where they said they did, could not have seen what they testified to.  A view of the premises was moved for by the defendant, and no objection was made to the same by the State, and the court sent the jury down to view the premises, in charge of the high sheriff, accompanied by one agent on each side, such as each party chose to select, under proper directions from the court, to the officer, the jury, and the agents, as to how the view should be conducted.  One of the counsel on both sides went as agents with the jury.

And now the defendant moves that the verdict be set aside, and a new trial granted, because the aforesaid view of the premises was so conducted and managed that the jury derived therefrom the impression and belief that the witnesses, Clement and Carpenter, standing where they testified they stood at the time, could not see what those witnesses testified they did see ; whereas, the defendant says that at the time of said view it plainly appeared, and now appears plainly, and beyond all possibility of doubt, from a view of the premises in question, and from marks, traces, and indications then and now existing there and clearly visible, that those witnesses, standing as they testified they did stand, could without difficulty distinctly see what they testified they did see on that occasion.

And the defendant moves for leave to show to the court, in such way

and manner as the court may order, the above and other facts relating to the view aforesaid, which go to show that the jury derived therefrom impressions and opinions wholly unjust and injurious to the defendant.

Defendant also moves that judgment be arrested, because it is not set forth in the indictment that the person upon whom it is alleged that the rape was committed was not the wife of the defendant.

*Blair, Solicitor,* for the State.

*Hibbard, Burrows & Bartlett,* for respondent.

BELLOWS, J. The first objection is to the testimony of Mrs. Philbrick, that she had been very lame for three or four years, and stating the cause of it, and that she had ever since doctored for it.

The ground of the objection is not stated, but if, as would ordinarily be assumed, it was the general one that evidence of her physical condition was not admissible, we think it cannot be sustained, as it might be very material to show that by reason of infirmity she was unable to make resistance.

The objection insisted on in the argument is to the evidence that she had doctored for the infirmity ever since the birth of her son, but apart from the probable immateriality of the evidence there is nothing to show that this was specially excepted to at the time.

The same remarks may be made in respect to the testimony of Mrs. Pillsbury, which was of a similar character ; and besides we think her testimony as to Mrs. Philbrick having made complaints was competent.

The testimony of Glazier and others, as to the exhibition of strength by respondent in his encounters with others, we think was admissible. It is true that the strength put forth on those occasions was not capable of exact measurement, as in the case of raising a known weight ; but it might nevertheless afford better means of judging of his capacity of overcoming such resistance as the prosecutrix might have offered, especially, when the size and strength of the persons with whom he struggled was shown.

Of course, such testimony would not show respondent's exact strength, but it might tend legitimately to show that he possessed ordinary, or more than ordinary strength ; and the court could not say that to make out either would not be material.

How far back the parties should be allowed to go in the introduction of such testimony is within the discretion of the judge who tries the cause : *Wason* v. *Sanborn,* Rockingham County ; and in this instance we see no objection to the manner of its exercise.

The testimony of Gale to the statements of Deacon Berry, as to having had sexual intercourse with Mrs. Philbrick, was properly excluded, as it was merely an attempt to contradict the witness Berry upon an immaterial point, viz : that the prosecutrix had been guilty of an act of unchastity with him. *State* v. *Forshner,* 43 N. H. 89. In Forsh-

ner's case the question did not directly arise, but in the subsequent case of *State* v. *Abbott*, in Merrimack County, not yet reported, it was directly raised and settled in same way. 3 Greenl. Ev. sec. 214, and notes. For the same reason the testimony of Hodgdon and others was properly excluded.

The next exception is, that Mrs. Philbrick was permitted to state that she first informed her mother of the violence inflicted upon her, a week or ten days after the event, and to give reasons for her delay.

The grounds upon which is received the proof of complaints by the prosecutrix, made soon after the injury, are that they are corroborative of her testimony on the stand, and tend to repel the presumption that would arise from the absence of such complaints; for it is laid down, very generally, that if such complaints are not made soon, or within a reasonable time after the injury, or without any inconsistent delay, it is a strong though not conclusive presumption against the truth of the charge.

It is equally well settled, also, that the delay to make complaint may be explained by showing that it was caused by threats, or undue influence of the prisoner. It is, in truth, a question purely of fact to be determined by the jury; and how much the delay in making complaint ought to weigh against the prosecution must depend upon the circumstances of each particular case.

It would then clearly be proper to show the reasons of such delay; whether caused by the threats of the prisoner, inability caused by the violence, want of opportunity, or the fear of injury by the communication to the only persons at hand; otherwise a strong inference against the truth of the charge might be made, when upon a disclosure of all the circumstances the jury might properly find that the delay was neither unreasonable nor inconsistent with the testimony of the prosecutrix.

This point has been argued by the counsel for the respondent, as if the test of the competency of the evidence was, whether it was part of the *res gestæ*; but we think the views already suggested show that it is not received upon that ground in any case, but as affecting the credibility of the prosecutrix's testimony; and it has accordingly been held that where she is not sworn, such proof cannot be admitted. 3 Greenl. Ev. sec. 213, and cases cited; *People* v. *McGee*, 1 Denio, 19.

So also in all cases the evidence of complaints made after the injury, is confined to the mere statement of the fact of the complaint, without giving the particulars, or even the name of the perpetrator of the crime, which is wholly inconsistent with the idea that the evidence is admitted as part of the *res gestæ*.

The general views we entertain are recognized by Hawk. P. C. 176; 1 East's Crown Law. 447; 4 Blk. Com. 213; Wharton Cr. Law, 440; Roscoe's Cr. Ev. 862; 3 Greenl. Ev. 212; *Regina* v. *Osborne*, 1 Carr. & Marshman, 622; *State* v. *DeWolf*, 8 Conn. 99; 3 Starkie Ev. 1267.

In the case now before us the court could not say that the reason assigned for not communicating the fact of the injury to her parents, would

not properly tend to repel the presumption arising from the delay, and we therefore think it was rightfully received.

It would stand, indeed, upon the same ground as the admission of evidence to account for one's silence when that silence would operate against him. *U. S.* v. *Craig*, 4 Wash. C. C. Rep. 729.

The testimony of Deacon Berry, that Mrs. Philbrick requested him to remain with her until her father returned, appears to have been received without objection, and we think, therefore, that his statement of the manner of making the request, whether in earnest or not, was properly received, the objection not being to receiving the statement of the request, but whether it was in jest or earnest.

We think the evidence of his previous solicitations were properly admitted. It is true that the instances were somewhat remote in point of time, being at least more than six months before the act charged; but we think they were not beyond the limits within which the judge might exercise his discretion.

The evidence was admissible as tending to show the existence of a motive or passion that would render the commission of the act charged more probable.

Upon this ground, proof of previous improper familiarities between the parties was held competent upon the trial of indictments for adultery. *State* v. *Wallace*, 9 N. H. 515; *State* v. *Marvin*, 35 N. H. 22; *Commonwealth* v. *Merriam*, 14 Pick. 518.

The principle of these cases, we think, must govern the one before us, that is, the solicitations of the respondent evince a state of mind that renders the act charged more probable. It is true that it does not necessarily evince a disposition to accomplish his object by force; but it tends to show that all other restraints had been thrown off, and that a lustful intent towards the prosecutrix existed in the heart of the prisoner which would render the commission of the crime more probable. 1 Greenl. Ev. 9th ed. sec. 53, note 1, and cases cited; among them is *Cook* v. *Moore*, 11 Cush. 216–17, where an intent to conceal property was admitted to prove a fraudulent intent under the bankrupt law, though not in existence at the time of the intent shown. Roscoe Ev. 95.

Where it becomes material to show a guilty intent or knowledge, or a motive for the commission of the offence, evidence of this sort is constantly admitted: Roscoe's Cr. Evi. 90, 96; 3 Greenl. Ev. sec. 15, and notes; nor is it confined to the proof of an intent to commit the particular offence charged; but evidence of malice and former hostility may be received, although the act which indicates it may not point directly to the offence charged.

So, on the trial of an indictment for altering counterfeited bank notes, evidence of the previous utterance of others is admissible, though not of the same kind. Roscoe's Cr. Ev. 90, 96, and 3 Greenl. Ev. cited above.

So, on an indictment for treason, where the respondent had enlisted under the enemy, proof was admitted that he had attempted to prevail on another person to enlist, as evidence of the intent: Malin's Case, 1 Dallas, 33; and also that on a previous occasion, he had come among a

body of his own countrymen, supposing them, by mistake, to be the enemy's troops.   *Ibid.*

Where the question was, whether a conveyance was fraudulent in respect to creditors, proof was admitted of other fraudulent conveyances about the same time.   *Whittier* v. *Varney*, 10 N. H. 294.

So, also, where the question was, whether. a purchase of goods was procured by fraudulent pretences, proof of other purchases about the same time by similar pretences was admitted.   *Bradley* v. *Obear*, 10 N. H. 477.

The case of *Williams* v. *The State*, 8 Humph. 585, cited 9 U. S. Dig. 42, sec. 37, is to the effect that on the trial of an indictment for an assault with intent to commit a rape, evidence of previous assaults on the prosecutrix are admissible to show the intent of the assault in question.

We have been referred by defendant's counsel to the case of *Rex* v. *Lloyd*, 7 C. & P. 318 ; but the decision appears to have been at *nisi prius*, and no reasons assigned for it, that would justify us in departing from the principle of our own decisions.

As to the instructions upon the effect of the evidence of character, we see nothing of which the respondent can justly complain, for it is quite clear that its effect must depend in some degree upon the nature of the offence charged, and the character and directness of the proofs brought to sustain it.

So far as the directions went, we see no cause for exception, and if the respondent had desired further instructions, to meet the views suggested as those of Judge Shaw, he should have asked for them.

The defendant having inquired of his witnesses as to his reputation for morality as well as chastity, and having received a favorable answer, we think that, on cross examination, the State was properly allowed to test their accuracy by inquiries as to his reputation for selling liquor in violation of the law ; for the court surely cannot say that such acts are not immoral.

In regard to the instructions of the court that the jury should retire, not with any feelings that they would have the verdict one way or the other, but with a determination to consider and weigh the evidence, and then first of all to agree, and, second, to agree right, it will readily be conceded that it was erroneous if it was meant that it was more important that the jury should agree than that they should agree right.   This, however, could not have been intended by the judge ; but as the verdict is to be set aside on other grounds, it is unnecessary to examine it further.

There is, also, a motion to set aside the verdict, upon the ground that the view which was had was so conducted that the jury were misled and the respondent injured ; and the evidence offered by the respondent is designed to prove that the condition of the fence between the door of Perkins' house and the spot, where certain witnesses of respondent were supposed to stand when making observations to which they testified, had been changed by agents of the State a short time before the view, by replacing the top board of that fence, which at the time of the alleged of-

fence was off; that the effect of this change was such that, whereas those witnesses, at the time to which their testimony relates, could, in the then condition of the fence, distinctly see a man at the door of said Perkins' house, yet by replacing the board in question, the view of that door was wholly obstructed, and thereby the jury were misled, and induced to discredit entirely the testimony of these witnesses upon a point material to the defence, and the respondent contends that the board was improperly so replaced, and with the purpose of influencing the jury in the manner stated.

On the other hand, the State's counsel urges that the board was replaced a short time before the view, without any reference to it whatever, and by one not acting for the State, but acting in perfect good faith, and merely to restore the board to the place from which it had been removed but a day or two before, and which it was in at the time of the alleged offence; and the State's counsel also contends that the jury could not have been misled, because a man at said Perkins' door could not be seen from the spot indicated, whether the board was off or on.

The evidence upon these points was very conflicting, but upon a careful analysis and consideration of it, we think the weight of the evidence to be :—That, with the board off, a person, standing at or near the spot described, could see a man standing on the door-stone in front of the east half of the door, that is, could see about one-half of his person, and that such a position upon the door-stone would not be unusual or unnatural in one seeking entrance; but that, with the board on, he could not see him at all, without stooping to look between the two boards, and, therefore, it might well be considered that in the position of these witnesses, with the board on, the man could not be seen at all by them; and also, that, on Sunday, May 4th, two days before the view on Tuesday, the board was found off by Isaac Merrill, who was summoned and attended as a witness for the State, but not examined, and who was shown to have made admeasurements and examinations in relation to this subject, and that he then replaced it in the condition it was at the time of the view; and it may be observed that the fact of the board being so replaced at that time by Mr. Merrill is not in controversy between the parties; but the question is, whether the board was off on the 16th December, 1861, and so remained during the winter, or whether it had been recently removed, when replaced by Mr. Merrill. Before it was so replaced, these witnesses had testified, and their testimony that they saw Knapp at the door and that he did not enter at all had caused a good many persons to examine the place; and Mr. Merrill states that, at the time he righted up the fence, he thought, as many persons would be looking there, he would put the board on, that it might look as it formerly did; and we think it is fair to presume, he was aware of the bearing its restoration might have, although he testifies that he did not then know that a view was to be had.

Under these circumstances, it is much to be regretted that both parties had not been notified of what he had done, before or at the time of the view, that the jury might have made their observations with the board off as well as on, and then have received evidence as to its actual con-

dition on the day of the alleged offence; especially, as Merrill was on the ground assisting Stevens in making observations and measurements for the State on the morning of the day when the view was had.

It is clear, we think, that perfect good faith required such notice, even if there was strong reason to believe that the board was but recently knocked off; and nothing short of an absolute certainty, at least, would excuse the omission. Even then, so important is it to avoid every appearance of unfairness in the conduct of trials, notice ought to have been given.

If, in a case like this, notice be not given, we think the burthen is thrown upon the State to satisfy the court that the respondent could not have been injured by the change.

In the case of *State* v. *Prescott*, 7 N. H. 287, where the jurors had been allowed to separate improperly during the trial, it being a capital case, the court decided that the burthen of proof was upon the government to show, beyond a reasonable doubt, that the prisoner was not injured thereby; and such proof not being adduced, the verdict was set aside.

Whether the same rule as to the quantity of evidence ought to be applied to this case or not, we think it is not enough to render it more probable than otherwise that the respondent was not injured; but that the court ought to be clearly satisfied on that point.

As we gather from the case and the evidence before us, the proof of the government went to show the commission of the offence in the house of Israel Perkins at a time which was specified, to meet which the respondent introduced the testimony of two or more witnesses who deposed to being in this wood-yard at that time, in sight of the door of this house, and that they saw respondent go to the door and apparently rap for admission, but that he did not go into the house.

To satisfy the jury, then, by an actual inspection of the premises, that, from the position occupied by these witnesses, they could not see a man standing at the door at all, might greatly injure the respondent, not only as rebutting the testimony of those witnesses, but by exposing him to the suspicion of having offered testimony known to be false.

If, therefore, the board was off at the time the offence is alleged to have been committed, it is obvious that respondent may have been seriously injured by its being replaced in the manner described.

Upon a careful analysis of the evidence on this point, we think it is rendered more probable than otherwise, that the board in question was *on* at the time of the alleged offence; but the court cannot fail to see that there is a serious conflict in the testimony, and that a jury might have reached a different conclusion without being subject to the charge of finding against evidence, even if it were a civil case.

We are, therefore, of the opinion that the government has not satisfactorily shown that the respondent could not have been injured by replacing this board upon the fence.

It appears, also, from the evidence, including the affidavit of the respondent and of his counsel, that neither of them had any notice or

knowledge of this change in the fence until after the trial was had and the verdict rendered.

It is urged that no wrong was intended on the part of Col. Merrill, and we can readily conceive that he may have fully believed that the board was but recently thrown off; still, we think that a scrupulous regard for a strictly impartial trial required that he should not have replaced the board without notice to the parties.

So, it is said that he could not be regarded as an agent of the State, and this may be strictly true; still, as a witness for the government, and aiding in the survey and admeasurements of the localities brought in question, his connection with the trial was such, if any were necessary, as to make it the duty of the court to interfere, in case the respondent, by an act of this kind, has been injured.

There are one or two other questions raised in the case, upon which the court is not prepared to express opinions, but as the verdict is to be set aside, and those questions may not again arise, it is not advisable to detain the case longer.

*New trial granted.*